We'll give you guys 20, all right? I understand that you wanted some extra time. Yes, if I can explain what happened. There are two different docket numbers. They weren't linked, so we each submitted our own acknowledgments. We were under the impression that we were going to carry the ball, and Mr. Golden didn't understand it the same way we did. So we each submitted the, this is the first we heard of it was this morning, so that's why the request. Okay, it's always been one case on our calendar, as far as I know, but anyway, we'll give you guys 20 minutes per side, and you'll, you can, I assume you're going to divide it evenly, right? Yeah, we would agree to 15 and 5. Fine. Unless you have a lot of questions about the Very good. Okay, I think that'll work fine. And I'd like to try to reserve three of my 15 for rebuttal, Your Honor. Okay, why don't you enter your appearance, and then we'll proceed. My name is Evan Tager, representing DIRECTV. May it please the There are, as the Court is aware, three different grounds on which the District Court declined to enforce the arbitration agreement. With respect to contract formation, the main point that I'd like to make is that the District Court, most of the grounds the District Court relied on were not raised by Perez, and were therefore not supported by any evidence. One example is the lease agreement's first reference to the customer agreement, which we contend was incorporated by reference, on the ground that the vendor had written over it. And I, let me pause here to say that the, that Ms. Perez was signed up for service by an independent dealer who did not work for DIRECTV, so that's why I use the term vendor. What do you mean he didn't work for, it may have been an Okay. Yes, independent contractor, precisely. But they use the term representative a lot in their brief, and that's a bit ambiguous. So, with respect to that first point, as the Court's aware, there's a summary judgment-like standard that applies here. So we come forward first with evidence to show contract formation, and then it is incumbent on Ms. Perez to come forward with evidence in response. And she did not raise this argument, and therefore did not present any evidence. Had she raised it, we then would have been able to submit evidence about the timing of the writing, which, you know, unfortunately because it was not put in issue, we, if you look at page 49 of the excerpts, those black bars are redactions that we did for her privacy after, when we were litigating in the District Court, because we didn't know what was there was going to be put at issue. But basically what it is, and here is an unredacted version which we would have put into the record had it been raised, it's basically her name, her home address, and her phone number, and her account number. And then at the bottom, you have her email address, and those were blacked out. But per force, it wouldn't have been possible for the dealer to have written her home address on it before he arrived at the store and presented it to her for signing. So that ground that District Court relied on is invalid, and I should also say that even if you consider it, you can still read through the writing. The second example is the District Court's holding that the reference to the customer agreement in the arbitration paragraph wasn't clear because elsewhere the ELA indicates that the customer agreement had already been provided, but that elsewhere is the paragraph that had been written over. So the District Court can't have it both ways. It can't say, well, we're not going to count the paragraph that was written over and then rely on the written over paragraph to create this ambiguity. And once again, she did not raise this argument. There was no evidence that she was confused or thought that the its context, it couldn't be clearer that they're two separate documents. Can I actually jump ahead to Section 90 with the exclusions for arbitration? Yes. There's language in there about the Communications Act. Yes. Can you give me your understanding of what that means, that portion of it? In terms of whether there's an exception for her claim or what the Communication Act means? No, I mean in the context of this case, I think it says, is there any dispute concerning the violation of the Communications Act of 1934? Yes. So what what would fall within that exception and what would not fall within that exception? What would fall within the exception is if we wanted to bring a hacking into the system or by moving the equipment from a residential address to a commercial address. There's a lot of different ways that a person could potentially violate the Act, which I must confess, it is impenetrable. I read it, but it is a statute that's broadly written. And so this kind of that the audit indicated and that some of the other cases we cited, Castillo and Joaquin involved, might fall within that statute. So we could proceed against her. She could bring a declaratory judgment action saying, stop harassing me, I'm not in violation of this statute. But it doesn't, the exception does not cover an saying that there's this scheme that DirecTV and all of these independent dealers all over the country are engaged in to cheat small business owners by deliberately signing them up for the wrong service, letting them use it for two years, auditing them, and then telling them if they don't pay a settlement they'll be sued. Do you have a copy of the complaint in front of you? It's in the excerpt of record. Did you have it with you right now? Yes. Could you go to paragraph 27, excerpt of record 214? Yes. So as I read paragraph 27, it says, it was therefore much to Ms. Perez's surprise that she received a phone call from the law office, who'd been retained by DirecTV, regarding the unauthorized reception and commercial display of DirecTV program at your establishment in violation of the Federal Communications Act. Why wouldn't that then fall within the 9D exception? If we had pursued that claim against her, it would have been within the exception. If she had said, pound sand, I'll see you in court, I'm going to bring a declaratory judgment action to establish that I'm not in the 9D exception. But her lawsuit doesn't turn on whether she violated or not. Her lawsuit is based on this alleged scheme to sign her up for the wrong service. So what, she doesn't have to prove that she either violated it or didn't violate it. Right, but that's not what the clause says. The clause says any dispute involving a violation. It doesn't say it has to be the grab-a-minute of your complaint. It says any dispute involving a violation. If their complaint says that your client accused them of violating that, that your lawyers accused her of violating the very law that there's an exception to in 9D, why isn't there, why doesn't this fall within the law's language? I don't think that that is a valid meaning of the term. Would you agree that the clause is at least ambiguous in that regard? Well, if it's ambiguous, the presumption under the FAA is it has to be construed narrowly. And we do have two judges, as I mentioned, Judge Gottschall in the Castillo case, Judge Shipp in the Joaquin case, who interpreted it the way we do. But wait, there was no allegation in the complaint in those cases about a violation of the law. Both courts addressed the issue of whether the second exception applied. Was there an allegation in the complaint like this one in paragraph 27? I don't have the complaint, so I can't answer it. We can be pretty confident those cases are distinguishable on that ground, that there was no direct allegation like this one in paragraph 27. That's why I think this case may be different than those two cases. Now, you have time in rebuttal, and your colleague on the table will have his five minutes to get into those cases. And if the court will allow us, we can certainly go back and pull that after and submit a letter with the answer. But I'm not sure if you ... For it to just turn on whether or not they cleverly added an allegation to a complaint, I think it's in tension with the whole notion that these exceptions need to be narrowly construed. But who drafted the language in the 9-D exception? Well obviously, DirecTV drafted ... So when you put language in there that says, any dispute involving a violation, that's pretty broad. And I think you said earlier that the act is impenetrable and it's very broad in application. So I'm just trying to see why wouldn't this exception apply here? I think that the key words are ... Aren't they any dispute involving a violation? Any dispute involving a violation. You're right. And so the question, if a dispute doesn't involve a violation, we think, and I think both Judge Gottschall and Judge Shipp thought, if neither side has to prove that it either was or wasn't violated, it is just entirely irrelevant to whether she can succeed on the claims she's pleaded, which are a UCL claim and a RICO claim. It just doesn't turn at all. I appreciate if the clause had said, if your claim turns on that claim or you allege a violation of it. I'm with you there, but that's not what the clause says. Any dispute involving. Well, but there has to be a violation proven or disproven, it seems to me. Not just any dispute involving an allegation of a violation. It doesn't say that. Well, but we don't know if there's a violation or not until we actually end the case, right? We have to go through all the litigation. Neither side would have to establish whether or not it was violated. But that's not what it, that's not what the, all right, we're kind of going around in a circle. Let me ask you this. In one of the cases you just cited, the Launstein Law Firm, there was a mention in that case that they actually sent a letter to someone saying there was a violation of the Communications Act. Yes. Okay. So if there were such a letter in this case, you're saying that still would not, so if the law firm sends a letter to a plaintiff saying your actions have violated the Communications Act, you're saying that still would not trigger 9D? For the same reason I said before, we don't dispute that if she had responded by saying I'm going to file a declaratory judgment action because I didn't violate the act, that that would be in court. But what, when you instead say I'm bringing a fraud claim, which is basically what her RICO claim is and their UCL claim, because you have this scheme to threaten people with violations, it doesn't matter whether, I mean, she, she could have been... I guess I'm trying to understand why, if the act has nothing to do with this case, why is the law firm representing Directive E telling people it does? Well it, it doesn't have to do with her, the lawsuit she's filed, her class action. But they're accusing her of violating the act. They did at the time and she settled that claim. That's the one, the one she settled is the one that... But isn't the settlement what led to this whole action? Isn't that why she's taking the action against them because she thought she was basically tricked into a settlement? The settlement... But then isn't this whole thing a dispute involving the Communications Act? That's how it all began. That was what caused her to file a lawsuit. So it's a dispute involving it then? I don't think it, it, it's a, it's a dispute involving the, an allegation of a violation. It is not a dispute involving a violation. And I think that's the line that the other two judges drew. And as you pointed out before, and I'm sorry, it was Judge Presnell who pointed out, it, it's at minimum, when you've got two other federal judges that read it the same way we do, it is at minimum ambiguous. And the rule in Moses H. Cohn, Publone, Tompkins, all of those decisions say that scope should be construed narrowly if there, if the, if an exception is ambiguous. But again, you don't know if those cases involved an allegation of the complaint, like paragraph 27. They certainly involved something because, you know, the, the, the allegations, the statement of facts in those cases basically say that someone came in there and induced them to violate, you know, to show, to show programming that they weren't allowed to show in a, in a commercial setting. So whether it's 1H, whether it's the Communications Act, they were accused of violating something that prohibited them from showing, from showing the, showing the, the content in a commercial, in a commercial business. And can I ask you just a general question? Your position is that if California, like most states I assume, has a principle of just You say that that principle in this context is preempted by the FAA, right? That's your position? Well, whether it, I suppose it is preempted, but If you're not going to agree with that, then let me just ask you why, if, if we were to agree as Judge Owens has suggested, that this provision at the very least is ambiguous and California does have a general principle of contract interpretation. It's not arbitration clause specific in any way. It applies to every single contract. Why wouldn't we just invoke that and say, you know what, you all drafted it. You're stuck with them. The ambiguity, we resolve it against you, end of case. So the, the answer is it would be preemption. I was trying to think whether it was just a, a basic federal interpretive principle, but it would have to preempt. So yes. But why? That's my question. I don't understand why it would be preempted. It's not arbitration specific. That's the only thing that the FAA can preempt, right? The state is not entitled to treat arbitration contract provisions differently from the way it treats all other contract provisions, but that's not what's happening here. The Supreme Court has held, held in Moses Cone a long time ago, and many courts, including this court, have since held that the FAA requires questions of scope to be favored, to be construed in favor of arbitration. And the corollary to that is exceptions must be construed narrowly. And that has to override a state law contra proferentum rule, even if it is a neutral one. Why? Well. I don't understand why. I, I, I get, because I, I remember from the get-go the, the principle that your, you states are not going to be allowed to come up with arbitration specific interpretation rules. I get that. But that is not what California is doing. It's just one, it's just applying, or we would just be applying a rule that cuts across every single contract. So why would there be any room for preemption? The Supreme Court has said that the purpose of the FAA is to favor arbitration. It said it over and over again. And so in the developing case law over the last 30 years, both the court and other federal courts have said that that perforce means that when there are questions of scope, including the scope of an exception, they should be, they should be construed in order to encourage arbitration of claims. And so it's, it's just a, a background FAA principle that I think is separate from the go to contract defenses, of course, and they don't really go to formation. So talking about formation, we're talking about interpretation of the interpretation of a, of the scope of a clause, which is not what section two goes to. So you know, the point about putting, putting arbitration agreements on equal footing and whether or not, you know, you have to apply state law even handedly, that's really more about... I don't think so. We're talking about using California law to potentially invalidate your arbitration provision. Not invalidate, just to say that this is outside the scope of it. Right. Well, I mean, not apply it, invalidate it, I mean, in the context of this case, right? Because California says, well, in this situation where there's ambiguity, it gets resolved against you. I just don't see why that would be preempted. That doesn't make any sense to me. Well, I... Have cases that... Yeah. ...say that the general state law principles of, just general principles of contract interpretation are preempted? We do, and if the court will allow us, we can submit those after the argument in a letter. Sure. I think I've spilled into Mr. Golden's time quite a bit. If you do, a couple minutes for rebuttal, but why don't we hear from your colleague? Thank you. Good morning. James Golden for Lonstein Law Office and Julie Cohn Lonstein, whom we refer to as the Lonstein defendants. I'd like to pick up where we left off with DirectDV's counsel, and that is the question of what happens if there's an ambiguity in an arbitration provision. In our brief, we cited to law on this point, so I think you can look at our reply brief. The first point I'd like to make is that under California state law, ambiguities in an arbitration clause are resolved in favor of arbitration. The Erikson versus Aetna Health Plans case that we cited states, quote, where an FAA, that's Federal Arbitration Act, contract is involved. Ambiguities in an arbitration clause are to be resolved in favor of arbitration, notwithstanding the California rule that a contract is construed most strongly against the drafter. The Supreme Court case that was cited by plaintiffs in their brief stated that if there's an ambiguity, we resolve it in favor of arbitration. Under state law, as under federal law, when the allocation of a matter to arbitration or the courts is uncertain, we resolve all doubts in favor of arbitration. So this court does not need to get into a preemption question at all, because if California law is applied, the ambiguity is still resolved in favor of arbitration. If we do want to get into federal law, we cited to a First Circuit case and to a Sixth Circuit case, both of which say that the policy in favor of arbitration trumps the policy of resolving ambiguities against the drafter. Your Honor asked why that would be, if we're just talking about general contract principles. The policy answer is that there are competing principles. One is, do we resolve contracts against the drafter? The other is, we have a strong policy in favor of arbitration. All of the courts have held, in that situation, the policy favoring arbitration trumps the rule that you resolve ambiguities against the drafter. And again, that's in California law as well. Next, I would like to get into the question about whether the Section 9d exception applies. That would only be relevant if you find that it's not ambiguous and that it unambiguously does apply. Because if it's ambiguous, we would need to proceed to arbitration. The G&G Circuits case, I think, is the most instructive here. Because that case, like this case, did reference the Communications Act, but only once. In that case, there was saying that the plaintiffs in that case couldn't bring a claim under the Communications Act, which is a little bit different than our case, which talks about a letter referencing the Communications Act. But in both, you just have one paragraph of a complaint talking about the Communications Act. And I think when you're talking about a dispute involving something, the involving has to be much greater than just a paragraph in a complaint giving background information as to why the complaint's being filed. This is what Judge Gottschall found in the G&G Closed Circuits case. As a result, to say, as the Casillos do, that they would not have needed to have filed a third-party claim against DirecTV, but for G&G bringing a Communications Act claim against them, shows why they initiated a dispute with DirecTV. Same thing as here. But it does not mean that the dispute between them and DirecTV necessarily involves the Communications Act. Indeed, the Casillos' amended third-party complaint mentions the Communications Act only once, and that mention disclaims the Casillos' standing to bring Communications Act claims against DirecTV for allegedly entrapping them. The Casillos' complaint of DirecTV's alleged practices of setting up residential accounts for commercial customers, failing to send contracts and documents, setting forth the and so on. These alleged violations of Illinois consumer protection law do not facially implicate the Communications Act. The same thing is true in our case. It's about an alleged scheme which, and this is important for the Launstein defendant-specific arguments, claims alleged that all of the defendants, including the Launstein defendants, were involved in a scheme whereby what they call DirecTV representatives, what's actually a third-party independent contractor, goes out, tricks people into signing up for residential accounts. Why do you all keep stressing that this person was an independent contractor? Does that absolve DirecTV and your clients of liability if the scheme went down as it did? I wouldn't think so. I don't think that fact is relevant to this appeal. Why do you keep stressing that? Both you and your colleague. I don't get that. You obviously want to distance yourself from some pretty disgusting behavior, not, I don't know about on your client's behalf, but certainly DirecTV's. I'm curious just to hear what your colleague is going to say as to what the real defense to this is. It strikes me as pretty clear-cut that DirecTV shouldn't be engaging in this behavior. So the fact that you all keep emphasizing that, well, this person didn't really work for us, I just don't see why that matters. I think it's a background fact. I agree. I don't think it's dispositive of the appeal. I agree with you on that. It really doesn't have anything to do with it. It's fairly well known that, at least in my view, cable companies, DirecTV, use independent contractors. That's the way they do business. Correct. I do want to pick up on your comments about this being a disgusting practice, and this is what I think led the district court to go astray more than anything else. I understand exactly why the district court did what it did. I understand exactly why. So I'd love to hear, if you think that this is defensible, I'd love to hear what the defensible is. Well, I think the district court looked at the allegations and said, I don't like this practice and looked at that in deciding whether or not to order arbitration. But in deciding whether or not to order arbitration, the only relevant questions are, is there an arbitration contract? Does it apply to the dispute at hand, and is it enforceable? You do not look at the merits of the underlying dispute. Whether DirecTV's behavior was reprehensible or not is relevant. There's a defense to what was going on because DirecTV, in its brief, says, well, we vigorously deny all of this, and it seems pretty clear-cut on its face, if you credit the account of the plaintiff here, that this was quite deceptive in terms of what happened to her. So far, all we have is a complaint and allegations. There's no discovery. The facts are going to be disputed. And when it goes to arbitration, I'm sure DirecTV will explain why nothing wrong happened here at all. Okay. This was not an isolated incident, either, because we know that DirecTV has been sued, and maybe your clients, too, have been sued in other very similar accounts in other parts of the country, right? So anyway, you're over your time. Thanks for your argument. We will give you, not you, but we'll give you two minutes for rebuttal. If you do have any questions about the Longstein defendant-specific arguments, I appreciate a chance to answer the questions.  No, no, no. You don't, but your argument was very helpful, so I'm glad that you took the five minutes to do so. Thank you. Okay. Let's hear from counsel for the plaintiff now. We'll give you your full 20 minutes. Thank you. May it please the Court. Catherine Odenbright for Dinaita-Perez. I think the Court's on the right track. This is not a simple mischaracterization of an account. This is a scheme that starts at the solicitation of the business owner for the services. The failure to disclose all of the terms of the contract is deliberate so that, as Mr. Trager almost said, it will invoke or cause the consumer to violate the agreement or violate the FCC. They're being set up from the beginning. This is a representative of DirecTV with DirecTV logo, DirecTV logo van. They install the DirecTV equipment right there at inception in a business establishment. So that person obviously knows that these services are going to be broadcast in a commercial setting. But what happens afterwards is even worse because what happens is DirecTV doesn't contact this client when they figure it out. They have the lawyer contact them and tell them they violated the FCC and tell them they're subject to tens of thousands of dollars in fines and attorney's fees and then say, oh, by the way, but we'll just settle. And that settlement is either a lower amount, $5,000 to $10,000, and usually includes also a requirement they purchase the commercial account for at least two years. I gather, I don't know this, but maybe you do. I gather that if the representative, when the person came to your client's shop to solicit her business, if he had sold her the, I guess there's a separate commercial account as opposed to a residential account, it costs more, I mean, a lot more, I don't know. Typically it does, yes. It's probably double a month depending on whatever promotions they're running. And so what is happening is as part of settlements from the lawyer, they're getting DirecTV more business at a higher price and then saying to the customer, okay, you can pay us less up front. You won't owe us $70,000. You can pay us $5,000 or $10,000, but you have to buy a commercial account for the next two years. So not only do they have to settle this FCC claim that comes with the threat of going to court, not arbitration, it says we will sue you in court. And Ms. Lonstein's declaration submitted to the district court below made clear that she, her purpose was to either settle or sue them and accusing them of these violations. But the problem with the arbitration clause starts from the beginning. Purposely, these people are not provided with a full set of the terms and conditions of the agreement. And so in addition to Ms. Perez, and we believe other customers as well because they're targeting minority businesses, you know, she did not speak English. The representative spoke to her in Spanish. The agreement was in Spanish, the one page lease agreement. And she was told these are the, this is it. And I'm sorry, I apologize, your honor. Yes, it was in English. And in fact, DirecTV admits they didn't send her anything in Spanish for almost a year. So how was she to know even where to go look at these additional terms? Well, but you signed the contract. That's the problem, right? I think California law is pretty clear that, you know, if you want to take that risk, that's on you. It's sort of up to you to be more vigilant about protecting your rights. You don't just put your signature on something that, you know, presumably you can't read and understand. And that is correct, your honor. But it goes towards, if we find a contract was formed, the unconscionability analysis. And it's not as if, as appellants say that, well, we just have to presume she understood. It's part of the whole set of facts that the court found below that can really only be disturbed if, if they were, if there was an error below. It's not the de novo review like the actual agreement itself. Additionally, California looks at an objective standard. And in some of the cases cited by the appellants or most of the cases, there was an issue with the credibility of the plaintiff of whether or not they really understood. They had an interpreter available that could, that could relay that information to them. We don't even know if the DirecTV representative spoke English. We have no way of knowing because he was communicating with her only in Spanish. In addition, the reference on the invoices that say, okay, here, you know, we sent you an invoice. Here's a reference to the website. Go look at the agreement. When you go to that link, there's about 12 agreements. One of which is the commercial account agreement. So again, how is the person supposed to know what the terms are? These terms are withheld from the customer and that is deliberate. In addition, just a comment that Mr. Traeger made, the court didn't rely on the blacked out portion as a part of its finding. There was no contract. It made the mention that, you know, even on DirecTV's evidence, you can't see that reference they're making. But the court did not adopt that and incorporate it into her finding. I'm assuming, but maybe you, you've seen that document that your, your opponent held up. I'm assuming that you can see the website address through whatever handwriting is on there? Well, we don't know because the copy we received has the blackout. They, they, they. He didn't show you that document? No. Now, I believe it was in the record in this case and this appeal, an unredacted copy or unwritten over copy. But again, I don't know the, the foundation for that document because the one that they And your client didn't retain a copy of her own that you provided to the district court? She did not, your honor. Okay. Um, I mean, let's be clear, DirecTV is going after these people for alleged violations of the FCC. I don't think that the exclusion clause are ambiguous at all. It says actions involving, it doesn't say brought by DirecTV. It doesn't say brought only by, uh, DirecTV or its agents. And in fact, uh, in 1D, it actually says at you as the customer could bring a small claims action, which tells us that it's a reciprocal clause that the exclusion applies to either party bringing an action. Well, I don't think your opponent's disputing that. I think his position is just that the meaning of the word involving in that context means that that's the thing that's being fought over in the lawsuit, right? That in other words, it, the, the dispute's not involving a violation of the communications act unless the, whoever's going to decide the dispute would have to resolve, did you or didn't you? And he's just saying, well, that's not that issue in your claim, right? You're never going to have to prove whether she in fact violated the communications act or not. Well, we may have to, and there is a declaratory injunctive relief claim in this case under the UCL. So Mr. Trager says, well, that's the action they could bring. We brought that. And it does invoke a lot of the, uh, under the UCL claim, a lot of the communications act. I don't know if it says the federal communications act expressly, but it is a lot of the communications acts that have to do with disclosures and, um, and, and those types of things. So I would argue that it does have to do with that. It is an action involving, but it's, why does the violation of the communications act of 1934 have to be a result? Whether your client did or did not violate that statute, why would that need to be resolved in the claims that you've brought? Well, if we move for injunctive relief, we have to show the client or the customers were not wrong. They didn't violate the act and they should stop pursuing these actions against them. No, I guess I assumed that your, um, real contention against direct TV was simply one of disclosure, right? That you, you can't, well, disclosure or, you know, having this person then sign you up for a residential account that you're obviously not going to be qualified for, um, cause they're installing it at your business. So it has nothing to do with whether the communications act was violated. I think even if it was, you would still be entitled to prevail if you were able to prove everything that you've alleged, right? Well ultimately at a trial, yes, it's going to be this scheme which is set up to set the to violate the FCC or at least for the accusation to violate the FCC, um, whether or not ultimately issues, uh, involving the FCC and whether or not anything was violated. I don't anticipate that, but it could come up in the action, especially with declaratory and injunctive relief claims. Um, is it the core of the action? No, but it is definitely an action involving because that's exactly what these people are being accused of violating. Is the FCC, which is bringing them into this, causing them to put money out and then causing them to be forced to secure additional, uh, direct TV services at a higher cost. So in this case, the, the letter that your client received from the von steen firm, it accused her of violating the communications act. It was a phone call in my, in my client's case, there have been cases where there are letters. Oh I see. Um, she received a phone call and then she received a settlement agreement and um, and then that's went from there. Did the settlement agreement reference the FCC? I am not a hundred percent positive your honor, but I know that it talks about claims relating to piracy. Well, it doesn't really, it doesn't clearly lay out what exactly she was accused of doing and what dispute was being set aside. That's why I thought there might've been a demand letter, but it was just simply a phone call. Correct. She received phone calls. Uh, at one point, uh, apparently direct TV did not have a correct email, so I'm not sure miss lawnstein had her correct email, so that might be how they initiate conversations or these types of things. I know this is a motion to dismiss. The only thing I saw in this case was paragraph 27, which had the reference to the phone call about the communications act at this, I'll call it pleading stage. Is there any other pleading or document that's been incorporated into the complaint that would bolster this idea that there was this claim about the communications act or is it just paragraph 27? Um, I don't know the specific paragraphs your honor, but there is additional allegations that the court pointed out. The district court pointed out about the theft of services and um, and the piracy and those things which would be encompassed within the FCC. That's where the language comes from. But okay. But specifically communi... What jumped out at me was paragraph 27 is what it jumped out as or anything else like paragraph 27 that's such a clear statement that this dispute involves that act. I believe we did file a first amendment complaint and I believe the Lawnstein defendants submitted that as part of this record. Um, and that will talk more about the accusations that are being made by the Lawnstein firm and probably encompass more language regarding the FCC, but I do not know for certain. Now, getting to the concerns regarding the interpretation of the contract, um, Justice Watford, I believe you were on the right track. If you believe appellants, arbitration agreements are not only entitled to preference, it's required they're given preference. And that is not what our Supreme Court has said. Our Supreme Court has made clear they stand on equal footing. And while there is a preference for arbitration proceedings, I don't believe the Supreme Court meant you give arbitration agreements preference over every other agreement. Direct TV has drafted this agreement. It included two exclusions where it is clear that the action should be going to court, not to arbitration. It may have meant for it only to, you know, to apply to them, but that's not how it's written. It's written in a way where it's an action involving, and regardless of whether this action will have to prove claims under the FCC or prove the theft of services, it is definitely an action that involves those statements, which is what the exclusion covers. And that is going to be a big part of this trial, if we get there, is that these statements and accusations of theft and what they were used for in the, in the potential RICO scheme. So I believe that the clause, that even if a valid arbitration agreement is found, that the scope of this action is excluded from arbitration expressly. And finally, getting to the Launstein defendants, again, this is a, this is a scheme that starts with an auditing company. The auditing company is owned by the Launstein defendants. So their auditing company goes and finds the violation. And then, again, DirecTV doesn't call the customer. They immediately get a demand letter, a very strongly worded demand letter or a call, and says, this is, this is what you're facing. You better contact us right now. And these are not the typical demand letters. You send it out, you wait a couple weeks, you may get a response, oh no, it's repetitive. Our client received four or five phone calls within a matter of days. It's a very aggressive collection effort. And as I suspect, when we're sent back to the district court, we'll be addressing the issue of agency and whether that's within the scope of a lawyer context under Norah Pennington, and we believe it will not be. Because we have alleged in our first amendment complaint, this is a sham. And this is a whole scheme involving the lawyers, and to some degree driven by the lawyers, to collect money from these people. But their argument is that you, you yourself, or I don't know if it's you, but your client has alleged that they were acting as the agents of DirecTV and that under settled case law, that means they do get to invoke the benefits of the arbitration provision, assuming that DirecTV can. Well, in your honor, as this court noted in Mohammed versus Uber, general allegations of agency don't rise to the level of agent for purposes of taking advantage of the arbitration provision. We have alleged, they're part of the scheme, they're an actor in a necessary one in order to be able to get the money and collect the money from the people. So they're acting in concert more than as an agent. And we believe that the only allegations that the Law Enseam defendants have pointed to are the general allegations in the complaint, which would be under the Mohammed versus Uber case. In closing, your honors, this court is the last line of defense in this case. There have been other cases similar, but not exactly. And none analyzed under California law. And that is a big distinction in the Castillo case. The Castillo case was analyzed under Illinois law, Illinois contract formation interpretation, and ultimately it's consumer statute. We believe that this case should go forward, that DirecTV has expressly excluded the claims, and also the district court supporting her findings of unconscionability and lack of formation. And we ask you to affirm the district court's opinion. Thank you very much. Thank you, counsel. If you could put two minutes on the clock, we'll hear from counsel for DirecTV. Thank you, your honor. First to get back to the preemption point, the two cases we cited in our reply brief on page 15 are the First Circuit's decision in Christian and the Sixth Circuit's decision in Huffman. And second point, your question about why are we emphasizing independent dealers, they're alleging a scheme. Imagine how can you, what's the likelihood of proving a scheme involving hundreds of other co-conspirators, all of whom are necessary for the scheme to work? That's why, I mean, we're not at the merit stage, but just think of. It's pretty easy to imagine how this would work. I don't have any trouble imagining that, really. This would be a bigger criminal enterprise than the mafia. You've got people all over the country that you're basically telling, engage in fraud. What happened at Wells Fargo? Well, that was at least within the company. Wow. Any one of the- A lot of people involved, right? It's people all over the country. Yeah. I'm not sure you're arguing what I was helping you. Well, it's not relevant here. It's just I wanted to explain why I thought it was significant. It's not. I just don't, that's why I was questioning why both you and your co-counselor raised it. I just don't think it's significant at all. If your independent contractors are going out and doing this, you're still, it seems to me, going to be liable for any fraud that's perpetrated on your behalf. On an agency theory, if there's fraud committed by an agent, you're liable, but this is different. They're alleging a conspiracy directed by DirecTV that would involve hundreds of people all over the country, any one of which could blow the whistle if it truly was a fraud. Okay. Why don't you address the merits of whatever you wanted to say? On the merits of the case, I just want to, you seem to think it's open and shut. We have cases in which people live in the same structure as their commercial establishment. Think of living upstairs, where they sign up for the service for their residence, and then they just move the equipment to their facility. This goes on regularly, so the idea that this is just some big scheme to cheat people. We have legitimate commercial interest to police people's misuse. So that, and of course- I grant you. I'm just saying what's particularly reprehensible here is that this, as I understand it, again, taking the plaintiff's allegations as true, is that this was an unsolicited approach. She wasn't interested in buying any services from your client. This person showed up at her shop, obviously a commercial establishment, installed the programming in the commercial establishment that he was standing in, and then signed her up for a residential account. I don't, that's what I'm saying, if that's to be believed, it's nothing close to what you just described as maybe the more- Well, they're alleging her specific facts, and then a much bigger conspiracy. I was addressing the latter. I'm talking about what happened in this case is disgusting, right? If you believe what she says happened, it's disgusting, it's reprehensible, and it's at the feet of your client, regardless of whether this person was an independent contractor or not. So in your brief, you kept saying, we vigorously dispute that any wrongdoing occurred, and I was waiting to hear, like, okay, well, what's the defense? And all I heard was, well, this person didn't actually work for us, and I just- No, that wasn't meant to be. Okay, so what's the defense of what happened in her case? Honestly, we haven't spoken to the dealer, so we don't know is the answer. Fine. Then why did you say in your brief, like, this is some crazy thing that she's alleging, and that it shouldn't be believed? It struck me as perfectly open and shut on the facts that she's alleged. What we wanted to convey was, it's a complaint, that's her allegations, we're not going to have a fight about her allegations in the context of a motion where they're not relevant, but we will dispute them at the appropriate time. That's all we meant to convey. What we're really dealing with here is whether a class action can be maintained, right? I mean, isn't that the main point of this whole proceeding? Well, obviously, if arbitration is enforced, there will be no class action. To respond to Ms. Odenbright's point about their requesting injunctive relief that would require them to prove a violation, I think if you look at the complaint on pages 228 to 229 of the excerpts, section C and section M, that's the injunctive relief, and I just don't read it the same way. So, going back to the bigger point on scope, I just don't think that either side needs to prove whether or not a violation occurred. I never got to address unconscionability. Does the court have any questions? Nope. You've used up your time. I have. Thank you for your argument. Thank you, Your Honor. The case just argued is submitted, and we will be in recess until tomorrow.
judges: Watford, Owens, Presnell